Jared G. Keenan (027068)
Anne Ronan (006041)
Nicholas Ansel (038448)
Arizona Center for Law
in the Public Interest
352 E. Camelback Road, Suite 200
Phoenix, AZ 85012
(602) 258-8850
(602) 926-0214 (Fax)
jkeenan@aclpi.org
aronan@aclpi.org
nick@aclpi.org

William H. Knight (030514)
National Homelessness Law Center
1400 16th Street NW, Suite 425
Washington, D.C. 20036
(202) 638-2535
whknight@homelesslaw.org

Brenda Muñoz Furnish (027280)
Michelle J. Simpson (020199)
William E. Morris Institute for Justice
3707 N. 7th Street, Suite 101
Phoenix, AZ 85014
(602) 252-3432
bmfurnish@mijaz.org
mjsimpson@mijaz.org

*Attorneys for Plaintiffs Circle the City and Valle del Sol, Inc., d/b/a Valle del Sol Community Health*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Circle the City and Valle del Sol, Inc., d/b/a Valle del Sol Community Health,<br><br>Plaintiffs,<br><br>vs.<br><br>City of Phoenix, a political subdivision of the State of Arizona; Matthew Giordano, in his official capacity as Chief of the Phoenix Police Department; Martin Whitfield, in his official capacity as Parks and Recreation Department Director,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**CIVIL RIGHTS ACTION (42 U.S.C. § 1983)** |

## INTRODUCTION

Humans have been called to help those in need from time immemorial. Caring for those in need is a core component of every major religion and secular moral philosophy. This fundamental principle transcends geographical, social, cultural, and religious boundaries.

The call to help those in need is also a core tenet of Plaintiffs Circle the City and Valle del Sol Community Health ("Valle del Sol"), mission-driven organizations that provide charitable medical care to our most vulnerable unsheltered neighbors. They meet Phoenix's homeless population where they are emotionally and, quite literally, physically, by providing their services in river bottoms, canals, alleys, street corners, and parks according to well-established best practices of Street Medicine.

But now, these organizations and their members face criminal sanctions should they fulfill their mission by providing humanitarian medical aid to anyone in a public park in the City of Phoenix ("Phoenix" or "City"). This is because the Phoenix City Council recently adopted a Medical Treatment and Food Distribution in Parks Ordinance ("Ordinance"), which imposes sweeping criminal restrictions on providing healthcare and feeding the hungry in public parks. Because the Ordinance's sweeping restrictions are content-based—restricting the provision of charitable medical care, but not the provision of all food and medical care in public parks—the Ordinance violates the First Amendment's Free Speech Clause both facially and as-applied to Circle the City and Valle del Sol.

Moreover, the Ordinance creates a permitting requirement in public fora that is a presumptively unconstitutional prior restraint. At the same time, the Ordinance violates Arizona's public policy as promulgated by the Arizona state legislature through the adoption of a statute that authorizes the establishment and operation of needle exchange programs without limitation. The Ordinance's prohibition of such programs and imposition of a limited permitting regime are therefore preempted by Arizona law.

For any or all these reasons, Circle the City and Valle del Sol respectfully seek declaratory and injunctive relief from this Court allowing them to continue their mission of providing charitable medical care and food to many of their patients in public parks without the threat of criminal prosecution.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to Article III, § 2 of the Constitution and 28 U.S.C. §§ 1331 and 1343(3), as the claims arise under the United States Constitution and present a federal question. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

2. This Court has supplemental jurisdiction over the Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

3. This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by 28 U.S.C. § 2202, 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil procedure.

4. This Court has the authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). Each of the Defendants' official places of business is located within this District. The events giving rise to this complaint are the enforcement, within this District, of an unconstitutional ordinance of the City of Phoenix in the State of Arizona by Defendants.

## PARTIES

6. Plaintiff Circle the City is an Arizona nonprofit corporation with its principal place of business located at 300 W. Clarendon Ave., Suite 200, Phoenix, Arizona 85013.

7. Plaintiff Valle del Sol Community Health (hereinafter, "Valle") is an Arizona nonprofit corporation with its principal place of business located at 3877 N. 7th St., Suite 400, Phoenix, AZ 85014.

8. Defendant City of Phoenix is a municipal corporation in Arizona. Its principal place of business is 200 W. Washington St., Phoenix, AZ 85003. The City is sued in its official capacity.

9. Defendant Matthew Giordano is the Chief of the Phoenix Police Department. He is charged with the supervision and management of all decisions and actions of the Phoenix Police Department. He is sued in his official capacity.

10. Defendant Martin Whitfield is the Parks and Recreation Department Director for the City of Phoenix. He is charged with the planning and directing of park and recreation facility development and improvement. He sued in his official capacity.

## FACTUAL ALLEGATIONS

### The Homelessness Crisis in Phoenix & the Need for Street Medicine & Harm Reduction

11. Over 7,000 people are currently experiencing homelessness in the City of Phoenix.[1] Of that number, almost half are unsheltered.[2]

12. Because unhoused and unsheltered individuals do not or cannot readily access healthcare services in the community, this already vulnerable population faces higher rates of untreated chronic illnesses, heightened risk of contracting an infectious

---

[1] *Over Half of Phoenix's Unhoused Residents Now Sheltered as City Expands Capacity*, PHOENIX.GOV, https://www.phoenix.gov/newsroom/homeless-solutions-news/over-half-of-phoenix-s-unhoused-residents-now-sheltered-as-city-.html (last visited June 15, 2026).

[2] *Id.*; *2026 Point-in-Time (PIT) Count Report*, MARICOPA REGIONAL CONTINUUM OF CARE, https://maricopacoc.org/wp-content/uploads/2026/05/2026-Maricopa-CoC-PIT-Report.pdf (last visited June 15, 2026).

disease, over-reliance on emergency rooms, and a life expectancy between ten and thirty years shorter than the general population.[3]

13. Unhoused individuals frequently carry both emotional and physical trauma, and "have likely been failed by institutions many times in their lives, and their mistrust of authorities, institutions, and individual care providers may represent an attempt at self-protection that, over time, becomes a barrier to accessing care and resources that could improve their lives."[4]

14. This population also often suffers from co-occurring substance abuse, mental health, or physical disorders, the intersection of which makes navigating the complex sphere of resources for the unhoused difficult.[5]

15. That is why mission-driven organizations like Circle the City and Valle del Sol provide Street Medicine services, which deliver healthcare to unhoused individuals in river bottoms, canals, alleys, street corners, and parks. "A critical component of the outreach model of care delivery is meeting individuals where they are physically and emotionally."[6]

16. Street Medicine provides "health and social services developed specifically to address the unique needs and circumstances of the unsheltered homeless delivered directly to them in their own environment. The fundamental approach of Street Medicine is to engage people experiencing homelessness exactly where they are and on their own

---

[3] *Healthcare and access to healthcare in homeless people*, NATIONAL LIBRARY OF MEDICINE, https://pmc.ncbi.nlm.nih.gov/articles/PMC9282039/#abstract1 (last visited June 15, 2026); *Disparities in Health Care for the Homeless*, INSTITUTE FOR HEALTH POLICY AND LEADERSHIP, LOMA LINDA UNIVERSITY HEALTH, https://ihpl.llu.edu/blog/disparities-health-care-homeless (last visited June 15, 2026).

[4] MELISSA JEAN ET AL., NAT'L HEALTH CARE FOR THE HOMELESS COUNCIL & HCH CLINICAN'S NETWORK, *Street Medicine and Outreach: Bringing Care to People Where They Are*, *in* HEALING HANDS 2, https://nhchc.org/wp-content/uploads/2022/06/healing-hands-june-2022.pdf (2022) (last visited June 15, 2026).

[5] *Id.*

[6] *Street Medicine*, CIRCLE THE CITY, https://circlethecity.org/street-medicine/ (last visited June 15, 2026).

terms to maximally reduce or eliminate barriers to care access and follow-through. Visiting people where they live — in alleyways, under bridges, or within urban encampments — is a necessary strategy to facilitate trust-building with this socially marginalized and highly vulnerable population. In this way, Street Medicine is the first essential step in achieving higher levels of medical, mental health, and social care through assertive, coordinated, and collaborative care management."[7]

17. Thus, the efficacy of the Street Medicine model requires care providers to go "to the same places every week and on a reliable schedule, because the consistency helps people know where to find them."[8]

18. "Harm Reduction is . . . a movement for social justice built on a belief in, and respect for, the rights of people who use drugs."[9] Harm Reduction accepts that drug use exists and "responds in a compassionate and life-preserving manner."[10] "Fundamentally, a harm reduction approach meets people where they are, engaging with them and providing support."[11]

---

[7] *About Us*, STREET MED. INST., https://www.streetmedicine.org/about-us (last visited June 15, 2026).

[8] MELISSA JEAN ET AL., NAT'L HEALTH CARE FOR THE HOMELESS COUNCIL & HCH CLINICAN'S NETWORK, *Street Medicine and Outreach: Bringing Care to People Where They Are*, *in* HEALING HANDS 11, https://nhchc.org/wp-content/uploads/2022/06/healing-hands-june-2022.pdf (2022) (last visited June 15, 2026).

[9] *Principles of Harm Reduction*, NAT'L HARM REDUCTION COAL., https://harmreduction.org/about-us/principles-of-harm-reduction/ (last visited June 15, 2026).

[10] HARM REDUCTION FRAMEWORK, CTR. FOR SUBSTANCE ABUSE PREVENTION, SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN. 6, https://www.waukeshacounty.gov/media/lp3hyerk/harm-reduction-framework.pdf (2023) (last visited June 15, 2026).

[11] *Id.* at 7; *see also* 10–11 (documenting that the foundational principles of harm reduction approaches include "respect[ing] autonomy," "practic[ing] acceptance and hospitality," "provid[ing] support," "connect[ing] with community," "provid[ing] many pathways to well-being across the continuum of health and social care," "valu[ing] practice-based evidence and on-the-ground experience," "cultivat[ing] relationships," "promot[ing] safety," and "work[ing] toward systems change").

19. Harm Reduction implements these understandings and beliefs by (1) providing safer practices for substance use through needle exchange programs, overdose education, naloxone distribution, drug-checking education and drug test strips, and basic wound care; (2) assisting individuals in finding safer settings to live and use drugs through providing access to safe housing and promoting "public health programs as alternatives to arrest and any legal system involvement"; and (3) providing safer access to healthcare by offering "[l]ow-barrier treatment services" and "[n]onpunitive care that consistently offers the standard of care in a nonstigmatizing, nonjudgmental manner and does not refuse healthcare."[12]

20. Access to Harm Reduction services is consistently shown to improve individual and community outcomes . . . [and] [m]ost importantly, harm reduction approaches save lives.[13]

**Circle the City**

21. Circle the City is a nonprofit charitable organization and a Federally Qualified Health Center ("FQHC"), designated as such by the federal government in recognition of its commitment to serving medically underserved populations. *See* Declaration of Plaintiff Sister Adele O'Sullivan, on behalf of Circle the City, attached marked as **Exhibit A,** ¶¶ 3, 4.

22. Circle the City was founded in 2010 by Sister Adele O'Sullivan, CSJ, MD, whose life's work is a direct expression of Circle the City's mission "[t]o create and deliver innovative healthcare solutions that compassionately address the needs of all individuals facing homelessness in Maricopa County." *See* **Ex. A** at ¶¶ 4, 5, 9.

23. Central to that mission is Circle the City's belief that "[a]ll individuals deserve to be treated with dignity and to have access to necessary healthcare" and that "[a]n individual's lack of housing should not prevent that individual from receiving healthcare." **Ex. A** at ¶ 5.

---

[12] *Id.* at 12–14.
[13] *Id.* at 7.

24. Consistent with that belief, Circle the City recognizes that individuals experiencing housing insecurity are less likely to seek medical services in traditional healthcare settings. The organization accordingly meets patients "where they live," including in "river bottoms, canals, alleys, street corners, parks, and other outdoor locations," to establish the critical level of trust unhoused individuals often require before engaging with healthcare providers. Circle the City has found that building and sustaining that level of trust demands "repeated encounters in the spaces these patients occupy." *See* **Ex. A** at ¶¶ 5, 11, 37

25. By engaging with unhoused individuals "where they live," Circle the City aims to forge the relationships necessary to "connect [those individuals] with housing and comprehensive medical services." Circle the City's Street Medicine program is thus a direct expression of that commitment, grounded in the organization's shared belief that "meeting an individual where they are" is the predicate to meaningful, lasting care. **Ex. A** at ¶ 5.

26. To operationalize this belief, Circle the City launched its Street Medicine program in 2015 with the deployment of its first Mobile Medical Unit. *See* **Ex. A** at ¶¶ 9–10.

27. Today, Circle the City's outreach has grown to include five mobile medical units and five Street Medicine teams, each dedicated to "deliver[ing] healthcare directly to unhoused individuals who do not, or cannot, readily access traditional primary healthcare services." The Street Medicine program is now one of Circle the City's "most essential programs," and for many of the individuals Circle the City serves, "street medicine teams provide the only medical care they are able or willing to access." *See* **Ex. A** at ¶¶ 9–10, 16–17.

28. Circle the City provides comprehensive care, meaning it covers primary, preventive, and behavioral healthcare services. The provision of these services frequently requires the use of needles, syringes, bandages, wound dressings, IV fluids, and other

medical materials. That said, Circle the City does not provide any needle exchange services. *See* **Ex. A** at ¶¶ 12, 18.

29. During Phoenix's dangerously hot summer months, Circle the City also "deploys resources including clean water, cooling towels, portable fans, solar-powered chargers, and IV fluids to treat severe dehydration in the field." **Ex. A** at ¶ 20.

30. In the past, Circle the City routinely distributed granola bars to patients encountered during its outreach operations. For example, a Street Medicine team may provide a patient with a granola bar when they encounter a person in a park who is diabetic and has a history of fluctuating blood sugars. Circle the City offers protein supplements, as "part of the standard treatment for wound healing is the addition of protein supplements to their diet." **Ex. A** at ¶¶ 33–34.

31. Circle the City's Street Medicine teams typically arrive at public parks in a single vehicle, parked discretely within the park's parking lot, and provide individualized, one-on-one care to approximately two to ten patients per visit. Circle the City's presence does not create lines or crowds. **Ex. A** at ¶ 26.

32. Circle the City provides each patient it treats through its outreach teams with a business card bearing the organization's contact information and clinic locations, as well as a community resource guide. The organization also provides general medical education to individuals experiencing homelessness, further advancing the goal of meeting patients where they are and empowering them to engage with the healthcare system. *See* **Ex. A** at ¶¶ 13–14.

33. In carrying out this work, Circle the City actively engages patients across a wide range of public parks throughout the City of Phoenix, including: "Central Park, Cancer Survivors Park, Cesar Chavez Park, Cielito Park, Encanto Park, Hermoso Park, Hayden Park, La Pradera Park, Margaret T. Hance Park, Mountain View Park, Norton Park, Solano Park, Steele Indian School Park, Townsend Park, Coronado Park, Cave Creek Park, Cactus Park, Thunderbird Park, and University Park." **Ex. A** at ¶ 15.

34. Circle the City's providers are Board certified and licensed by their respective licensing boards, so they are required to follow the standard of care for their professions and abide by the regulations for proper disposal of medical waste. Moreover, because Circle the City is licensed by the Arizona Department of Health Services ("ADHS"), the organization is subject to inspections, on-site surveys, and complaint investigations. When providing care to patients in the parks, Circle the City's providers strictly comply with the provisions for medical waste disposal set forth in Ariz. Admin. Code §§ R18-13-1407 and R18-13-1419. *See* **Ex. A** at ¶ 31.

35. Circle the City has never received a complaint or been informed of a complaint to the City of Phoenix regarding their medical services or waste left behind in the parks. Nor has Circle the City ever been cited for a violation of a crowd ordinance or littering ordinance. *See* **Ex. A** at ¶¶ 21, 26, 31.

**Valle del Sol Community Health**

36. Like Circle the City, Valle del Sol Community Health is a nonprofit charitable organization and a FQHC, designated as such by the federal government in recognition of its commitment to serving medically underserved populations. *See* Declaration of Plaintiff Mike Renaud, on behalf of Valle del Sol Community Health, attached marked as **Exhibit B,** ¶¶ 3–4.

37. Valle del Sol was founded in 1970 as a social justice advocacy organization and part of the Chicano movement, providing culturally centered services that "spoke the patient's language, respected their heritage, and treated them with dignity." **Ex. B** at ¶ 5.

38. Valle del Sol's mission is "to transform lives through compassionate, culturally centered care that empowers individuals and communities." Valle is dedicated to "fostering a new generation of diverse, visionary leaders who champion equity, inspire progress, and drive lasting positive change." **Ex. B** at ¶ 4.

39. Valle del Sol provides harm reduction services to the unhoused population as a direct expression of their belief that (1) every person has inherent value and deserves

to be treated with dignity, respect, and positive regard, and (2) traditional healthcare systems are not meeting the needs of the unhoused. **Ex. B** at ¶¶ 14, 39.

40. Valle del Sol began its street outreach in 2023, initially meeting with individuals living on the streets and in city parks and educating them on treatment options without yet providing medical care or harm reduction services. In 2025, Valle del Sol received a grant from Maricopa County to provide harm reduction services throughout the County. Today, Valle del Sol's shared organizational goal for its street outreach services is to "get[] people off the streets and into treatment." The grant funding from Maricopa County has allowed Valle to further that goal by "implementing harm reduction practices and medical care when our street outreach teams connect with an unhoused individual." **Ex. B** at ¶ 7.

41. In order to meet patients where they are, Valle del Sol's street outreach team "travels between parks, washes, alleys, and canals in Central Phoenix in [their] mobile health units . . . ." because the individuals Valle del Sol serves do not reside in predictable locations, the organization's street outreach teams does not operate on a fixed schedule or pre-announced route. Valle del Sol does not advertise or schedule visits, does not hold events that create lines of people waiting for services, and its work does not generate crowds. **Ex. B** at ¶¶ 8–9, 25–27.

42. Valle's outreach team prioritizes "building genuine relationship[s] of trust and compassion with unhoused individuals." Staff listen to individuals' stories, provide education on treatment options, and distribute care kits containing sealed foods (*e.g.*, granola bars), Gatorade, clean needles, fentanyl testing strips, intra-nasal Narcan, sharps disposal containers, and literature on Valle's substance use treatment program. In Valle's view, the organization's consistent contact with unhoused individuals in the parks is the means by which Valle has built—and will continue to build—the trust necessary to encourage those individuals to participate in treatment available through Valle's clinics. **Ex. B** at ¶¶ 10, 15, 17.

43. For many unhoused individuals Valle serves, this outreach constitutes the only available means of addressing their chronic medical, mental health, and substance use disorders. **Ex. B** at ¶ 16.

44. Valle's outreach staff distribute clean needles and sharps containers to unhoused individuals and collect used needles directly from those individuals for safe disposal. This exchange reduces the volume of discarded needles in parks and public spaces. Valle employees have never observed discarded sharps in the parks they serve, nor have they ever received a complaint about needles or sharps related to the charitable healthcare services they provide. Absent this intervention, resourceless drug users will reuse the same needle repeatedly, dramatically increasing the risk of HIV, hepatitis C transmission, and overdose. **Ex. B** at ¶¶ 10, 14–16, 29–30.

45. Valle is licensed by ADHS, and is thus subject to inspection, and strictly complies with all medical waste disposal requirements under Ariz. Admin. Code §§ R18-13-1407 and R18-13-1419. **Ex. B** at ¶ 29.

**The Medical Treatment & Food Distribution in Parks Ordinance**

***Restrictions & Legislative History***

46. In late 2025, the Phoenix City Council began exploring restrictions on the provision of medical treatment in public parks.

47. In December 2025, the City Council proposed Ordinance G-7467 as the first iteration of a formal and legal restriction on the provision of medical treatment in public parks.

48. Ultimately, on May 6, 2026, the City Council adopted Ordinance G-7514 (the "Ordinance"). The Ordinance imposes prohibitions on (1) medical treatment, (2) needle exchange, and (3) food distribution unless granted one of two daily permits allowed per month. *See* City of Phoenix Ordinance G-7514, attached marked as **Exhibit C.**

49. First, the Ordinance prohibits any organization from providing "medical treatment to any person other than (A) a family member or (B) a person to whom they are a caregiver without first obtaining a permit from the Director." Phoenix City Code § 24-

45(C)(3). "Medical treatment" means "any act that involves the use of needles, syringes, other medical sharps, or produces medical waste as defined by A.R.S. § 49-701(32), including but not limited to bandages and dressings." Phoenix City Code § 24-45(B)(7).

50. Second, the Ordinance separately prohibits "any person, group, or organization to conduct the sale, distribution, or exchange of syringes or needles or conduct a needle exchange or a needle exchange program." Phoenix City Code § 24-45(C)(2).

51. Third, the Ordinance prohibits any organization from conducting "a food distribution event at a park without obtaining a permit from the Director prior to the event." Phoenix City Code § 24-45(D). A "food distribution event" is defined as "a gathering conducted . . . for charitable or similar humanitarian purposes, at a park, that is . . . conducted to distribute food to any member of the general public at no cost or for a nominal charge." Phoenix City Code § 24-45(B)(6). "Food" is defined as "any product, other than water or electrolyte beverages, distributed . . . for human consumption." Phoenix City Code § 24-45(B)(5).

52. The permitting scheme is administered by the Director of the Parks and Recreation Department ("Director"), who may promulgate "rules and procedures for the issuance of permits," Phoenix City Code § 24-45(E)(1)–(2), but "may not issue more than two (2) permits for such services for the same park in any calendar month." Phoenix City Code § 24-45(E)(3)(i). Medical treatment and food distribution may therefore occur at any given park on, at most, two days per calendar month.

53. Permitted medical services must be provided only "on a park's parking lots or other hardscape areas, but not including sports courts, designated picnic areas, or similar dedicated park amenity spaces and in an enclosure sufficient to ensure patient privacy and the containment of any waste." Phoenix City Code § 24-45(E)(3)(ii). Qualifying enclosures include "medical tents or other similar tents with a roof, all opaque sides, and a tarp or other impermeable floor, and vehicles . . . that are equipped and intended for mobile medical treatment within the enclosed space of the vehicle." Phoenix

City Code § 24-45(E)(3)(ii)(2)(a)–(b).

54. Any violation of the Ordinance, i.e., distributing food of medical care without a permit, constitutes a Class 1 Misdemeanor, punishable by up to six months' imprisonment. Phoenix City Code § 24-45(H).

55. The Ordinance's exemptions confirm that it targets, by design, the charitable provision of medical care and food to vulnerable populations. The food distribution permit requirement does not apply to "family events such as celebrations, weddings, meals, or reunions or informal gatherings of family or family friends; and events that are not open to the general public." Phoenix City Code § 24-45(G)(3). The food restrictions apply exclusively when distribution is conducted "for charitable or similar humanitarian purposes" or "at no cost or for a nominal charge." Phoenix City Code § 24-45(B)(6).

56. Likewise, the medical permitting requirement does not apply to care provided to "(A) a family member or (B) a person to whom they are a caregiver," a category the Ordinance defines to include a "legal guardian, babysitter, nanny, friend, teacher, nurse, or medical practitioner." Phoenix City Code § 24-45(B)(1), (C)(3). Those individuals and organizations face no limitations on where they may provide or receive medical care.

57. The Ordinance itself acknowledges its intent and the nature of what it restricts by design in its language. Its preamble expressly recognizes that "individuals and organizations have historically provided services, including the distribution of food and medical care, at no cost or low cost to individuals in need," and that "[s]uch activities align with the city's overall aspiration to provide supportive care to vulnerable populations that frequently take place in parks." **Ex. C** at 1.

58. Between December 2025 and May 2026, approximately twenty-five to thirty organizations worked collaboratively over several months to identify alternative solutions to the concerns underlying the proposal. None of that work was reflected in the language of the final Ordinance.

59. Both Circle the City and Valle appeared before City Council during the December 17, 2025, and May 6, 2026, Council meetings. **Ex. A** at ¶ 22; **Ex. B** at ¶ 20.

60. Circle the City advised the Council that (i) the organization does not leave medical waste in the parks; (ii) the Ordinance could be revised in ways that would serve both the City's goals and the organization's mission; and (iii) the Ordinance would foreseeably result in increased deaths in parks, heat stroke and heat exhaustion, emergency room visits and hospital admissions, and an overload of the 911 system. **Ex. A** at ¶ 22.

61. Valle del Sol likewise advised that (i) there is no evidence that an ordinance of this type would reduce the presence of unhoused individuals in parks; (ii) chronic homelessness in the City is driven primarily by a shortage of shelter beds for individuals with serious mental illness or substance use disorder, who comprise approximately fifty percent of the current unhoused population; (iii) the appropriate policy response is permanent supportive housing, not the criminalization of healthcare; and (iv) restricting charitable medical care will not reduce trash, crowding, noise, or any of the conditions the Ordinance purports to address. **Ex. B** at ¶¶ 20–21.

62. Notwithstanding these advisements and the months of stakeholder collaboration, the City Council adopted Ordinance G-7514 on May 6, 2026.

63. The Ordinance took effect on June 5, 2026.

***Impacts on Circle the City***

64. The Ordinance directly prevents Circle the City from delivering life-saving medical care to unhoused individuals in Phoenix parks because its Street Medicine program is premised on meeting patients where they are, and the Ordinance makes that all but impossible unless Circle the City is given one of two daily permits per month. **Ex. A** at ¶¶ 5, 11, 23.

65. The two-permit monthly cap operates as a functional prohibition on Circle the City's park-based care. Circle the City's Street Medicine teams currently travel between parks seven days per week, locating individuals who most need care. That model requires flexibility as Circle the City cannot know in advance which parks its often

transient patients will be in on any given day, and because its patients are frequently unable to travel from where they are to a different location to receive care. The cap thus forces Circle the City "to abandon patient visits, leaving vulnerable individuals without care they depend upon and have come to expect." **Ex. A** at ¶¶ 24-25.

66. Circle the City has made the decision not to apply for permits as the permitting process is "inherently antithetical to both Circle the City's belief in the fundamental human right to dignity and healthcare and Circle the City's expression of that belief in the form of meeting people where they are." **Ex. A** at ¶ 40.

67. Even if Circle the City were to apply for a permit, such permits are entirely unavailable for three parks where Circle the City actively engages patients (*i.e.*, Central Park, Cancer Survivors Park, and Townsend Park), eliminating Circle the City's ability to provide any medical care in those locations. **Ex. A** at ¶ 15.

68. By requiring that permitted events be confined to parking lots, the Ordinance poses safety risks to both Circle the City's patients and providers. Asphalt absorbs solar radiation, and surface temperatures are often tens of degrees higher than on grass. Many of the individuals served by Circle the City lack proper footwear and will risk severe burns to access care on hardscape. **Ex. A** at ¶ 28.

69. Similarly, the Ordinance's physical enclosure requirement is operationally unworkable because Circle the City's Street Medicine model is designed to minimize clinical formality, which is a primary barrier that causes unhoused individuals to disengage from care. Requiring providers to erect a tent or confine treatment to a closed vehicle as a precondition to care undermines the therapeutic relationships on which the program depends. Many patients will simply walk away rather than enter such a structure. **Ex. A** at ¶ 27.

70. The enclosure requirement also compounds Phoenix's extreme heat as Circle the City's teams already must cease outdoor treatment by approximately 11:00 a.m. during summer months, and sealed, opaque enclosures will accelerate heat exposure and further shorten the window during which care can safely be delivered. **Ex. A** at ¶ 27.

71. Because a permit is now mandated for charitable food distribution, Circle the City has since removed granola bars from patient bags and stopped providing food to those in medical need (*e.g.*, diabetics at risk of blood sugar crises and patients requiring protein supplements for wound healing). **Ex. A** at ¶¶ 33–34.

72. Circle the City strongly believes that the Ordinance's "cumulative effect will result in preventable suffering and death" because it will inevitably "curtail Circle the City's ability to provide the Street Medicine services and heat relief interventions upon which thousands of unhoused Maricopa County residents depend." Circle the City is concerned that without their provision of care, that Phoenix unhoused population "will not obtain equivalent care from other providers. They will go without." **Ex. A** at ¶ 37.

***Impacts on Valle del Sol Community Health***

73. Like Circle the City, the Ordinance's "sweeping restrictions on the provision of medical treatment and food distribution in Phoenix parks" will adversely impact "Valle's operations and the patients who depend on [them]." **Ex. B** at ¶ 22.

74. Valle has found that "the Ordinance imposes restrictions that are incompatible with the delivery of harm reduction services, and it does so under threat of criminal prosecution." **Ex. B** at ¶ 38.

75. For example, the Ordinance's two-daily-permits-per-park monthly cap itself is incompatible with Valle's harm reduction model, which depends on the flexibility to follow unhoused individuals across multiple parks as they move unpredictably throughout Phoenix. Unlike scheduled events that generate crowds, Valle's outreach involves a single vehicle meeting with roughly eight to ten individuals per visit, making it impossible to pre-schedule park locations or expect patients to travel across the city to reach permitted sites. In practice, the cap effectively ensures that the majority of unhoused individuals in Phoenix will go without critical care. **Ex. B** at ¶¶ 24–27.

76. Likewise, the Ordinance's blanket prohibition on the distribution and exchange of needles and syringes critically limits Valle's harm reduction model, which depends on distributing clean needles, educating patients on safe disposal, and collecting

used sharps in parks. Such services reduce needle waste rather than contribute to it. **Ex. B** at ¶ 28-29.

77. Notably, Valle is a licensed, inspected provider with a spotless complaint record, and its staff regularly collect used needles that individuals voluntarily hand over, meaning the Ordinance would eliminate the very people currently keeping parks clean while doing nothing to address the City's stated waste concerns. **Ex. B** at ¶¶ 29–30.

78. Beyond the public safety contradiction, the criminal liability created by the Ordinance leaves Valle with no choice but to curtail life-saving services built on trust and repeated contact. **Ex. B** at ¶ 31, 35.

79. Next, the Ordinance's requirement that all permitted medical care be conducted within an enclosed structure on hardscape areas is operationally unworkable for Valle, whose street outreach model depends on providers walking throughout parks to reach individuals who are too ill or physically unable to travel to a mobile medical unit. In practice, this restriction would force Valle to turn away the most vulnerable patients. **Ex. B** at ¶ 32.

80. Valle also finds that the Ordinance's food distribution prohibition will directly harm unhoused individuals who rely on the snacks Valle includes in its harm reduction kits. And because Valle already thoroughly cleans up trash throughout the parks—including waste generated by other park-goers—the Ordinance's implementation will undermine its stated purpose of reducing food waste. **Ex. B** at ¶¶ 33–34.

81. The threat of criminal prosecution will chill the willingness of Valle's employees to participate in the program and will harm Valle's ability to help unhoused individuals leave the parks and access the treatment they need. **Ex. B** at ¶ 35.

82. Finally, the Ordinance is in direct conflict with Valle's grant from Maricopa County, which requires Valle to provide the very services the Ordinance either prohibits outright or restricts through permitting requirements Valle cannot practically satisfy. **Ex. B** at ¶ 23.

## LEGAL CLAIMS

**Count I (42 U.S.C. § 1983)**
**Violation of the First Amendment's Free Speech Clause – Unconstitutionally Burdening Protected Expressive Activity both Facially and As-Applied to Plaintiffs**

83. Plaintiffs re-allege and incorporate by reference all the preceding paragraphs in this Complaint.

84. Providing food and essential medical care to the unhoused community is an inherently expressive activity because it unquestionably conveys a clear, particularized message: namely that all people deserve dignity, all people deserve access to food, and all people deserve medical care.

85. The Ordinance bans such expressive activity in public parks, where the government's ability to restrict expression is severely limited. *See United States v. Grace,* 461 U.S. 171, 177 (1983).

86. "The protections afforded by the First Amendment are nowhere stronger than in streets and parks, both categorized for First Amendment purposes as traditional public fora." *Berger v. City of Seattle*, 569 F.3d 1029, 1035–36 (9th Cir. 2009) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

87. The regulation of speech and expressive conduct, "is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gibert*, 576 U.S. 155, 163 (2015).

88. The Ordinance is a content-based restriction on speech and expressive activity because it only targets activity that expresses a particular message, namely the open and public provision of charitable aid through food distribution and medical care to vulnerable persons. According to the text of the preamble of the Ordinance, the Phoenix City Council adopted the Ordinance because of the Council's disagreement with the message Plaintiffs communicate through their provision of charitable medical care in public parks

89. Because the Ordinance is content based, it must satisfy strict scrutiny and Defendants must demonstrate that it "furthers a compelling interest and is narrowly

tailored to achieve that interest," *Garcia v. County of Alameda*, 150 F.4th 1224, 1233 (quoting *Reed*, 576 U.S. at 171), which the City cannot do.

90. Even if the Ordinance were content-neutral, it would still violate the First Amendment as an unreasonable time, place, and manner restriction on free expression as there is no connection between the harms the City seeks to address with the Ordinance and the expressive activity of Plaintiffs.

**Count II (42 U.S.C. § 1983)**
**Violation of the First Amendment's Free Speech Clause – Unconstitutional Prior Restraint both Facially and As-Applied to Plaintiffs**

91. Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs in this Complaint.

92. A permitting system requiring a speaker to obtain prior government approval before engaging in protected expression is a prior restraint bearing a "heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

93. A permitting scheme governing expressive activity in traditional public forums is constitutional only if it is (1) "justified without reference to the content of the regulated speech," (2) "narrowly tailored to serve a significant governmental interest," (3) "leave[s] open ample alternative channels for communication of the information," and it (4) does "not delegate overly broad licensing discretion to a government official." *Kaahumanu v. Hawaii*, 682 F.3d 789, 803 (2012) (citations omitted).

94. The First Amendment forbids unfettered discretion in permitting regimes regardless of whether an official has issued permits because "[t]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

95. Permitting regimes "must be sufficiently specific and objective so as to effectively place some limits on the authority of . . . officials to deny a permit." *Epona v.*

*County of Ventura*, 876 F.3d 1214, 1222 (9th Cir. 2017) (citation and internal quotation marks omitted).

96. The Ordinance grants the Parks and Recreation Director unbridled discretion to grant or deny food distribution and medical treatment permits.

97. The Ordinance fails to provide narrow, objective criteria to guide the Director's selection of applicants.

98. The Director retains absolute discretion to make final permitting decisions, and has no obligation to issue any permits, even to applicants that pose no risk.

99. The limited nature of the Ordinance's permitting system, which only allows for medical treatment and/or food distribution two times per month in a given park, substantially undermines the ability to provide medical treatment and food to the unhoused community, even in a manner that is safe and unobstructive.

100. There is no requirement that permitting officials support their decision with objective evidence." *See Epona*, 876 F.3d at 1224.

101. The Director need not provide any explanation as to the reasons for denying a requested permit. *See Spirit of Aloha Temple v. County of Maui*, 49 F.4th 1180, 1192 (9th Cir. 2022).

102. Finally, the Ordinance delegates to the Director the ability to engage in viewpoint discrimination by allowing him to choose between different forms expressive activity with no guidelines. The Ordinance restricts both medical treatment and food distribution and allows only two daily permits per public park each month. In the event that competing applications force the Director to choose between allowing food distribution or medical treatment, the Director retains unfettered discretion to prefer one over the other.

103. Thus, the delegation of expansive discretion in the permitting regime is an unconstitutional prior restraint on speech in violation of the First Amendment.

**Count III (A.R.S. §§ 12-1831 *et seq.*; A.R.S. § 12-1801)**
**Violation of State Preemption Doctrine**

104. Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs in this Complaint.

105. Article XIII, section 2 of the Arizona Constitution grants home-rule municipalities the full right of self-government in local and municipal matters. "Accordingly, [cities] may exercise all powers granted by [their] charter, provided that the exercise is not inconsistent with either the constitution or general laws of the state." *City of Tucson v. Rineer*, 971 P.2d 207, 208-09, ¶ 2 (Ariz. Ct. App. 1998) (citing *Jett v. City of Tucson*, 882 P.2d 426 (Ariz. 1994)).

106. Under Arizona law, "[a] state statute preempts a local ordinance when (1) the municipality creates a law in conflict with the state law, (2) the state law is of statewide concern, and (3) the state legislature intended to appropriate the field through a clear preemption policy." *State v. Coles*, 324 P.3d 859, 860, ¶ 6 (Ariz. Ct. App. 2014) (citations omitted).

107. The Ordinance entirely prohibits the "distribution, or exchange of syringes or needles or conduct[ing] a needle exchange or a needle exchange program" in public parks. Phoenix City Code § 24-45(C)(2).

108. Arizona Revised Statutes ("A.R.S.") § 36-798.51 authorizes "nongovernmental organization[s]" to "establish and operate an overdose and disease prevention program."

109. Under A.R.S. § 36-798.51(B), an overdose and disease prevention program must offer (1) "[d]isposal of used needles and hypodermic syringes," and (2) "[n]eedles, hypodermic syringes and other injection supply items at no cost and in quantities sufficient to ensure that needles, hypodermic syringes and other injection supply items are not shared or reused."

110. The express purposes of A.R.S. § 36-798.51 are to facilitate the State's interest in "reduc[ing] the spread of hepatitis, HIV, and other bloodborne diseases," "increase[ing] proper disposal of used syringes," and "encourag[ing] individuals who inject drugs to enroll in evidence-based treatment." A.R.S. § 36-798.51(A)(1)-(5).

111. First, subsection (C)(2)'s restrictions on needle exchange programs and services are in direct conflict with the State's express authorization of such programs. Unlike the state statute, the Ordinance completely prohibits needle exchange programs in public parks. In doing so, the Ordinance undermines these state-protected treatments in the locations and communities where they are most needed.

112. Second, A.R.S. § 36-798.51 governs a matter of statewide concern because it addresses broad-ranging public-health and safety interests, it applies uniformly across Arizona, and its effects sweep more broadly than just to local residents.

113. Third, in enacting the state statute the Arizona Legislature signaled an intent to appropriate the field by enacting comprehensive protections for needle exchange programs as critical tools in addressing the healthcare and societal issues of addiction and the spread of disease.

114. Accordingly, subsection (C)(2) of the Ordinance is preempted by A.R.S. § 36-798.51.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Issue preliminary and permanent injunctions restraining the Defendants, their successors in office, agents, employees and assigns, and all persons acting in concert with them from:

(a) Enforcing the Ordinance's restrictions on the provision of medical treatment and food distribution in Phoenix's public parks;

(b) Enforcing the criminal penalties provided in the Ordinance regarding the provision of medical treatment and food distribution in Phoenix's public parks;

(c) Enforcing the Ordinance's permitting process for the provision of medical treatment and food distribution in Phoenix's public parks;

(d) Prohibiting the provision and operation of needle exchange programs by nongovernmental organizations in Phoenix's public parks.

2. Issue a declaratory judgment declaring that:

(a) The Ordinance's restrictions as to medical treatment and food distribution violate the First Amendment by unconstitutionally burdening free speech rights both facially and as applied to Plaintiffs;

(b) The Ordinance's restrictions as to medical treatment and food distribution violate the First Amendment because they constitute unconstitutional prior restraints on the free speech rights both facially and as applied to Plaintiffs; and

(c) The Ordinance's restrictions on needle exchange programs as provided in subsection (2)(C) are preempted by state law, namely A.R.S. § 36-798.51.

3. Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

4. Grant such other relief which is necessary and proper to protect the federal and state rights of Plaintiffs.

DATED this 15th day of June, 2026.

**ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST**

*/s/ Jared G. Keenan*
Jared G. Keenan
Anne Ronan
Nicholas Ansel
352 E. Camelback Rd., Suite 200
Phoenix, AZ 85012

**WILLIAM E. MORRIS INSTITUTE FOR JUSTICE**

Brenda Muñoz Furnish
Michelle. J. Simpson
3707 N. 7th Street, Suite 101
Phoenix, AZ 85014

**NATIONAL HOMELESSNESS LAW CENTER**

William H. Knight
1400 16th Street NW, Suite 425
Washington D.C. 20036

*Attorneys for Plaintiffs Circle the City and Valle del Sol Community Health*